FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

02 MAY 31   AM 10: 12

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| WILLIAM OMUNA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION NO. 99-JEO-1970-M |
| | ) |
| SERGEANT LARRY TEAL, | ) |
| OFFICER JOHNNY ROSS LANKFORD, | ) |
| OFFICER JOHN GARRARD, and | ) |
| OFFICER JEFFREY BURDICK, | ) |
| | ) |
| Defendants. | ) |

**ENTERED**

**MAY 31 2002**

## MEMORANDUM OPINION

This matter is before the court for decision on the merits following a non-jury trial on

April 1-2, 2002. After consideration of the testimony, exhibits, and arguments of the parties, the

court finds that judgment is due to be entered in favor of the defendants.

## I. PROCEDURAL BACKGROUND

Plaintiff William Omuna (hereinafter "Omuna" or "the plaintiff") was an inmate in the

Alabama penal system at the time he filed his *pro se* complaint pursuant to 42 U.S.C. § 1983.

Since the filing of this lawsuit, the plaintiff has been transferred to the Dekalb County Jail in

Atlanta, Georgia, the Paulding County Detention Center in Dallas, Georgia, and the Colquitt

County Jail in Moultrie, Georgia. The plaintiff alleges that he has been deprived of rights,

privileges, or immunities afforded him under the Constitution or laws of the United States of

America and names as defendants, Sergeant Larry Teal and Jailers Johnny Ross Lankford, John

Garrard, and Jeffrey Burdick, all employees or former employees of the Etowah County,

Alabama Jail. The plaintiff alleges that the officers subjected him to cruel and unusual

99

punishment in violation of the Eighth Amendment when they handcuffed him, physically assaulted him, sprayed him with a chemical spray, shocked him with an electric shock device, and secured him in a restraint chair. As compensation for the alleged constitutional violations, plaintiff seeks forty-seven million dollars in damages.[1] (Doc. 1 at 16).[2]

On November 3, 1999, United States District Court Judge William M. Acker, Jr., entered an order dismissing all of the plaintiff's claims except the Eighth Amendment excessive force claim against Sgt. Teal and Officers Lankford, Garrad, and Burdick. All other defendants were also dismissed. (Doc. 12).

The court entered an Order for Special Report directing that copies of the complaint in this action be forwarded to each of the named defendants and requesting that they file a special report addressing the factual allegations of the remaining claim in the plaintiff's complaint. (Doc. 17). The defendants filed a special report, which the court considered as a motion for summary judgment. (Doc. 23). The plaintiff filed a response to the defendants' motion for summary judgment. (Doc. 30). The plaintiff filed additional evidentiary submissions. The undersigned recommended that the motion for summary judgment be denied on the excessive force claim. (Doc. 42). Judge Acker adopted the report and recommendation and denied the

---

[1] The plaintiff initially sought injunctive and declaratory relief in addition to damages, however, because all of these claims related to completed acts in the past for which damages would be the only avenue of relief and because the plaintiff is no longer housed at the Etowah County Jail where these claims are alleged to have occurred, he no longer has standing to seek injunctive relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983); *Tucker v. Phyfer*, 819 F.2d 1030 (11ᵗʰ Cir. 1987). Accordingly, these claims for relief were previously dismissed by the court. (Doc. 7, &12). The plaintiff's original complaint also included claims for assault and battery, intentional infliction of mental distress, negligence, and discrimination. Those claims were dismissed by the court upon agreement of the parties. (Tr. 3-5).

[2] References to "Doc. ___" are to the document numbers assigned the various pleadings by the Clerk of the Court.

motion. (Doc. 49).

A pretrial conference was conducted in this matter. Thereafter, the court appointed counsel to represent the plaintiff. (Doc. 68). The parties consented to the jurisdiction of the undersigned to try this matter without a jury.[4] (Doc. 44 & 54). The defendants filed a second motion for summary judgment that was denied. (Doc. 66 & 90). A second pretrial conference was conducted with counsel present. A pretrial order was entered. (Doc. 72). The case was tried on April 1-2, 2002. (Doc. 94).

## II. ANALYSIS

### A. The Evidence

The evidence presented divergent views of what occurred at the Etowah County Jail on June 4, 1999, while the plaintiff was incarcerated there as a detainee of the United States Immigration and Naturalization Service (hereinafter "INS"). The court will, therefore, begin its analysis by reviewing all the testimony.

#### 1. Mr. Omuna's Testimony

Omuna was arrested by the INS around June 23, 1998, premised upon his conviction on a prior offense. (Tr. at 9-10).[5] He was transferred to the Etowah County Jail on August 21, 1998. (*Id.*). He was housed in the maximum security unit. (*Id.* at 22). He remained there until July 7, 1999. (*Id.* at 11).

During the morning of June 4, 1999, Omuna was out of his cell around 9:15 a.m. for about thirty minutes, watching television and using the telephone in the unit. (Tr. at 11-12).

---

[4] *See* 28 U.S.C. § 636(c)(1).

[5] References herein to "Tr. at ____" are to the trial transcript that is found at document 94.

3

Later that morning, around 10:49 a.m., Omuna contacted "central control" complaining about an upset stomach and that he was having trouble breathing. (*Id.* at 14-15). He talked with Garrard who told him that he would notify the nurse of the problem. (*Id.* at 15). Omuna called Garrard around 11:20 a.m., complaining again. Omuna was told that Garrard would get back with him. (*Id.* at 16). After not receiving a response, Omuna called again at 11:29 a.m. (*Id.*). Garrard told him that the nurse was coming to see him. (*Id.*). When she did not come, Omuna rang again at 12:05 p.m. (*Id.* at 17). He told Garrard that it was "urgent" that the nurse come see him. (*Id.* at 17-18). Garrard told him that he would be taken to the nurse. (*Id.* at 18).

A short time later, Garrard and Lankford came to Omuna's cell to escort him to see the nurse. (Tr. at 18). Lankford entered the cell and handcuffed Omuna. (*Id.* at 19).[6] They escorted him out of the cell and downstairs to the booking area on the ground floor where the nurse was located. (*Id.* at 20-21, 25). When they arrived on the ground floor, Omuna was directed to cell three where he was to wait to see the nurse.[7] (*Id.* at 27-28).

When they entered cell three, Lankford pushed Omuna into the steel bed.[8] (Tr. at 29-30). Omuna's face was down on the bed, his hands were still handcuffed behind his back, and his knees were touching the ground. (*Id.* at 30, 32). Garrard immediately started spraying him with a chemical without saying a word. (*Id.* at 30-31, 96).[9] Omuna started yelling, "what did I do, what did I do?" His eyes were blinded by the spray. He recalled Officer Burdick coming into the

---

[6] It was standard policy to cuff inmates housed in maximum security any time they are moved. (Tr. at 116, 299-300).

[7] It was the usual practice for Omuna to be taken to this cell to be examined by the nurse. (Tr. at 27).

[8] The cell was approximately twelve feet by twelve feet. (Tr. at 42).

[9] The plaintiff had no problems with Lankford or Garrard prior to this incident. (Tr. at 31).

cell because he recognized his voice. (*Id.* at 32). He also saw Officer Freeman enter the cell. (*Id.*). Burdick began spraying him as well. (*Id.* at 33). Omuna was "struggling to get off the bed," but he was not intentionally kicking anyone. (*Id.* at 33). He was then "slung" into the wall. (*Id.*). Lankford, Burdick, and Garrard lifted Omuna to his feet and placed him against the wall. Lankford was still holding the cuffs while the other officers were holding Omuna. (*Id.* at 34-35).

While Omuna was against the wall, Sergeant Teal entered the cell with the NOVA Shield[9] and activated it. (Tr. at 36-37). Omuna states that he was not resisting at that time and he received no warning from Teal. (*Id.* at 37). He was shocked on his back. (*Id.* at 38). After the shock, he again was placed against the wall. (*Id.* at 39). Omuna was crying and shouting, "what did I do?" (*Id.*). The shield was activated a second time and Omuna fell to the bed on his stomach. (*Id.* at 39-40). Some of the officers fell with him. (*Id.*). Omuna then fell to the floor. Lankford put his knee on Omuna's chest. (*Id.* at 42). He was not kicked or struck by anyone's fist. (*Id.* at 43, 88). When he yelled because Lankford's knee was in his chest, Teal again shocked him with the shield near his kidney while he was on the floor. (*Id.* at 44-47). Freeman may have been holding his legs at that time. Omuna tried to raise up and he was shocked a fourth time on his back. (*Id.* at 48-50). He was still being restrained. (*Id.* at 50). Ultimately, he "passed out" for about seven minutes. (*Id.* at 51). The assault lasted for about fifteen to twenty minutes. (*Id.* at 60).

Teal next instructed the other officers to take Omuna to the restraint chair.[10] (Tr. at 51).

---

[9] The NOVA Shield is a defensive shield that is equipped with an electrical charge.

[10] One of the officers described the chair as a straight-backed, plastic chair that is uncomfortable. (Tr. at 447). The inmate is restrained by straps on his calves and chest and handcuffs for the hands. (*Id.* at 448-49). The officer described it as a means "to restrain somebody to protect themselves." (*Id.* at 452).

They carried him because he could not walk. (*Id.* at 53). He was placed in the chair. Someone[11] "patted" his face because it was burning from the mace. (*Id.* at 55). The handcuffs were taken off. (*Id.*). He was strapped into the chair. His legs were strapped around his thighs and shins. (*Id.* at 56). His hands and torso were also secured. (*Id.* at 57). A helmet was fastened on his head. (*Id.* at 58-59). He was placed in the chair between 1:45 and 1:50 p.m. (*Id.* at 59, 93). He states that he was left there for "four hours and twenty-five minutes." (*Id.* at 59-60, 65). No one came into the cell to check on him while he was in the chair. (*Id.* at 61). Someone checked on him twice through the cell door window. (*Id.*). A nurse never checked on him. (*Id.* at 65, 67).

After Omuna had been in the chair for about 45 minutes to an hour, Lieutenant George Taylor from the INS came into the cell. (Tr. at 61). According to Omuna, he said, "I have seen the tape, what did they do." (*Id.* at 62). He also said something about "the relief available to [him]," in "regards to [his] freedom." (*Id.* at 62-63). Taylor then went outside to talk with Lieutenant Pentecost who worked for Etowah County. (*Id.*).

Omuna was released from the chair around dinner time – 5:30 p.m. by Officer Burdick. (Tr. at 65). He was bruised, his tongue was swollen and bleeding, and he was suffering various body pains. (*Id.* at 70). He also states that he suffers from back pains since the incident. (*Id.*). He was taken back to cell three for about fifteen minutes. (*Id.* at 71). He was then taken back to his cell on the third floor. A nurse saw him around 6:30 p.m. while she was conducting her regular rounds. (*Id.* at 72). She asked if he was alright. He responded by asking "why" she was asking. (*Id.*). Omuna felt that she should have known that he was injured and that he needed medical attention. (*Id.*).

---

[11] According to Omuna, most likely this was Freeman. (Tr. at 55).

Omuna requested on the following day, Saturday, to see the doctor at the Wednesday sick call. (Tr. at 73, 75). He listed his injuries on the request: "Swollen hands, shoulder neck severe pain, bleeding nose, dislocated fingers, severe chest pain and a host of others." (*Id*. at 74). He told the doctor of his injuries. (*Id*. at 73, 76; Ex. 15). The doctor examined him and checked his reflexes. (*Id*. at 78). Omuna also stated that his speech was "very distorted." (*Id*. at 79). He also stated that he needed to take "fifty milligrams of Elavil just to make [him] sleep." (*Id*.). He stated that this was necessary to help him "deal with the situation [he] was in at that time when [he] was in the Etowah County jail."[12] (*Id*. at 79). He stated further that as a result of this incident he suffers from "flashack[s]," "severe anxiety, sleeplessness," and "paranoi[a]." (*Id*. at 79-80). He continues by stating that his 1996 back injury was worsened by this incident. (*Id*. at 82).

Omuna had no problems with any of the defendants prior to or after this incident. (Tr. at 85, 87). His prior sick call requests show that he received a Depo Medrol shot on May 2, 1999, for back pain; he was seen for swelling in one of his hands from a fall that occurred on March 14, 1999; he complained of "severe back pain" on March 1, 1999, from sleeping on the floor;[13] he was seen for a "serious medical problem" on October 22, 1998, and he wanted more Elavil,[14] and, he was seen on August 19, 1998, because he wanted "antidepressants and for 1000 mg. [of] ibuprofen" for his back injury in 1996.[15] (*Id*. at 88-92; Pl. Ex. 15).

---

[12] He stated that his dosage was increased to 200 milligrams after the incident. (Tr. at 80). He states that he is also now taking Prednixone and Zyprese and that he was taking Paxil but it was discontinued due to negative side effects. (*Id*.).

[13] The nurse's notes state, "Inmate not sleeping on floor. Inmate sleeping in boat," which is a temporary bed. (Tr. at 90).

[14] The plaintiff was on 100 milligrams of Elavil from September 1998. (Tr. at 91).

[15] He was seen numerous other time for various, unrelated problems. (Pl. Ex. 15).

In the plaintiff's rebuttal to the defendant's motion for summary judgment,[16] he states that he "was brutally beaten in a total of twenty-two to twenty-five minutes nonstop except for one or two jailers resting due to fatigue while others continued." (Tr. at 94). Two officers (Garrard and Burdick) emptied cans of pepper spray in his face. (Tr. at 95, Doc. 30, p. 2). He also states that Teal shocked him over 15 times with the shield, including when he was on the floor. (*Id.* at 98-99; Doc. 96, Attachment A, Omuna's letter to the Executive Director, Lawyers Committee for Human Rights, p. 3).[17]

### 2. John Garrard

Garrard was formerly employed by the Etowah County Sheriff's Department in the jail. He was familiar with the use of spray mace and the NOVA Shield, including that he believed that use of the shield should be videotaped. (Tr. at 104-08).[18] He was on the floor with Omuna when he (Omuna) asked to be allowed out of his cell to use the phone. (*Id.* at 111, 204-05). This was after his earlier 30 minute period out of the cell. (*Id.*). Omuna was not allowed out of the cell again. (*Id.*). Omuna next began making requests for medical assistance. (*Id.* at 205). Garrard moved Omuna from the third floor to the booking area without incident to see the nurse. (*Id.* at 110). When he was near the phone on the first floor, Omuna "leaned over and started looking towards the phone, wanting to . . . use the phone." (*Id.*). He asked to be allowed to use it. (*Id.* at 110, 123). He was not allowed to use the phone and was moved to a holding cell where he could

---

[16] The rebuttal is found at document 30.

[17] During the trial, the court noted that the exhibits, including this letter, were not attached to document 30, which is the plaintiff's rebuttal to the special report. Since trial, the court has located the original exhibit 30 and its attachments. They were located, and still are found, in the expandable file that includes the special report (doc. 23).

[18] At a later point in the trial, Garrard stated that he was not aware that videotapeing was required. (Tr. at 146).

8

wait for the nurse. When he arrived at the cell door, he said, "I can't go in there." (*Id*. at 113). He started resisting the officers by "twisting, turning, and slinging [the officers] around pretty well." (*Id*. at 117, 123, 206). Lankford was holding him by the cuffs. Lankford and Garrard moved him into the cell and toward the bed. (*Id*. at 118).[19] Burdick heard the disturbance, came into the cell, and sprayed Omuna one time with mace. (*Id*. at 125-27). Omuna jumped up and pulled the officers to the floor. (*Id*. at 125). He was then lifted off the floor by the officers. (*Id*. at 131-32). Omuna was asking, "What have I done?" (*Id*. at 133). The officers told him to be still and calm down. Omuna was pressed against the cell wall. (*Id*.).

Officer Freeman entered the cell and helped the other officers hold Omuna against the wall. (Tr. at 134). Sergeant Teal arrived a short time later with the NOVA Shield. (*Id*.). The officers "coached" Omuna to the bed. He became calm while the four officers were holding him. (*Id*. at 135). He was not resisting. (*Id*.). The officers backed out of the cell and closed the door. (*Id*.). Omuna remained inside handcuffed. (*Id*. at 135-37). Omuna then began "running in to the walls, yelling, hollering, kicking, hitting his head against the walls, the door, everything." (*Id*. at 137). At this point, the officers went back into the cell. (*Id*.). Teal led the officers, using the shield, and placed Omuna against the wall. Teal activated the shield on Omuna when he was cuffed and against the wall "to calm him down." (*Id*. at 141). Omuna settled down a little; but, he felt it was necessary to activate the shield again. Omuna then became calm and was placed on the bed, still handcuffed. (*Id*. at 141, 144). Garrard left the cell, but stayed in the area. (*Id*. at 142-43).

Garrard did not participate in the decision to put Omuna in the restraint chair and did not

---

[19] He did not see Omuna's head pushed into the bed or the floor. (Tr. at 207).

9

move him. (Tr. at 143). However, his placement in the chair did not surprise Garrard because he noted that Omuna had "exploded twice. He could do it again." (*Id*. at 144).

Garrard prepared an incident report concerning the events. (Tr. at 148). He believed he turned the report in the day of the events. (*Id*.).[20]

The Monday after the incident, Garrard saw Omuna on the third floor. Omuna "apologized for his behavior the Friday before." (Tr. at 208). He had no prior altercations or difficulties with Omuna. (Tr. at 207).

### 3. Donna Preston

Preston was an LPN working at the jail. She received a call that Omuna was complaining of shortness of breath. She requested that he be brought down to the infirmary. When Omuna arrived in the booking area, "[h]e became upset and started fighting with the officers." (Tr. at 157). She did not see the officers do anything to provoke him. (*Id*.). Omuna would not stay in the cell, and the officers were "trying to get hold of him to calm him down." (*Id*. at 158). She did not see the spray or NOVA Shield being used, nor did she hear what was being said. (*Id*. at 159, 192).

She testified regarding Omuna's medical history, including his May 5, 1999 doctor's visit where he was given a shot of Depo Medrol for his back problem;[21] his June 5, 1999 complaints of dizziness; and, his June 9, 1999 visit with the doctor. The doctor's notes show that he examined Omuna on June 9, 1999. His observations were not consistent with someone who had

---

[20] The incident report was not located. (Tr. at 297). Pursuant to policy, an incident report is required no later than the end of the individual's "tour of duty" when force is used. (Pl. Ex. 1).

[21] Depo Medrol is used for chronic back pain. (Tr. at 163). The plaintiff apparently injured his back in 1996. (*Id*. at 174).

been beaten by jailers for "fifteen to twenty-two minutes." (Tr. at 162). Preston noted that the medications Omuna was taking before and after the incident were similar except that he was taking more Elavil.[22] (*Id.* at 172). She also noted that Omuna was seen by another nurse, Becky Jones, at 6:30 p.m. on June 4, 1999. When Jones asked Omuna how he was doing, he told her that he was doing fine. (*Id.* at 164).

Preston did not notice any evidence of injuries, cuts, bruises, wounds, or scars on Omuna. (Tr. at 177-78). Preston believes she checked on Omuna when he was in the restraining chair because it was "normal protocol." (*Id.* at 194). However, she had no independent, specific recollection of checking on him. (*Id.* at 197). She also did not make any entries on Omuna's medical chart that she examined him. (*Id.* at 196). Although Omuna did not request medical assistance on the day of the incident, he did see the doctor on June 9, 1999, after making a sick call request.[23] (*Id.* at 202-04).

#### 4. Ross Lankford

Deputy Lankford handcuffed Omuna and moved him downstairs with Garrard. (Tr. at 234-35). When they got to the booking area, Omuna asked to use the telephone. (*Id.* at 235).[24] Lankford was with Garrard at the time of the altercation. When they got into the cell, Omuna

---

[22] Elavil is use for depression. (Tr. at 171).

[23] In the request, he states:

I need to see the doctor ASAP as a direct result of the massive beating sustained on 6-4-99 at 12:05 p.m. thro (sic) 1:30 p.m. by several custody officers. My injuries are as follows: swollen hands, shoulder neck (sic) server pains, bleeding nose, dislocated fingers, severe chest pains and a host of others. Without examining me the nurse told them to return me to unit after waiting for 25-35 min. This (sic) personal injuries need documentation for future consequences, including numerous bruises & cuts.

(Pl. Ex. 15, p. 4).

[24] The phones on the cell blocks allow only collect calls, while the phone in booking is free. (Tr. at 236).

11

stated that he could not breathe and he could not go into the cell. (*Id.* at 224, 236-38). He started to back out of the cell. (*Id.*). Lankford told him he was going in and to sit down on the bed. (*Id.* at 237). He began fighting the officers. (*Id.*). Lankford did not push Omuna or force his face into the metal bunk. (*Id.* at 237). They all fell to the floor. (*Id.* at 238-39). Burdick came and sprayed Omuna one time. (*Id.* at 239-40). Lankford needed the help of the other officers to exit the cell. (*Id.* at 221). Lankford left the cell after the chemical spray was used. (*Id.* at 241). Omuna kept resisting Garrard and Burdick. (*Id.* at 241).

After the officers left the cell, Lankford stated that Omuna started beating on the cell door. (Tr. at 226). The officers were concerned about him. (*Id.* at 227). Lankford did not observe the NOVA Shield being used. (*Id.* at 214-15, 217, 222). In his deposition, however, he described the use of the shield by Teal. (*Id.* at 216-17). In his affidavit, he stated that he entered the cell with Teal and the other officers when Omuna would not move away from the cell door. (*Id.* at 217).

Lankford checked on Omuna while he was in the restraint chair at about 4:00 p.m. (*Id.* at 245-46, 251).

Lankford wrote an incident report. It took him two hours to complete it because he needed to clear his head from the pepper spray. (Tr. at 214). His incident report only discussed the incident to the point of Burdick spraying Omuna. (*Id.* at 214).[25]

As a result of Lankford's prior experiences with Omuna, he felt Omuna was a difficult inmate. He was "always complaining, always wanting to be a special case, always wanting to use the telephone, always wanting to do something or another other than what he's supposed to be

---

[25] The incident report is found at plaintiff's exhibit 2.

doing." (Tr. at 223).

Omuna apologized to Lankford for his behavior after the incident. (*Id*. at 244).

### · 5. Larry Teal

Teal was the second shift supervisor over the jail on June 4, 1999. (Tr. at 252-53). He had arrived at work early and was sitting-in for the first shift supervisor who was outside talking with the captain. He was sitting in the intake room and noticed the officers bringing Omuna to the booking area. (*Id*. at 254). Something caught his attention, he went to get the other shift commander so he could check on it.[26] (*Id*. at 256). When he went to the cell area, the officers were leaving Omuna's cell. Freeman was also by the door. (*Id*. at 260). One of the deputies told Teal that he had been kicked. (*Id*. at 260). The officers told him that Omuna had gone "ballistic." (*Id*. at 261). Teal tried to calm Omuna without any success. (*Id*. 261, 300-01). Omuna was still "hollering, screaming, and running back over towards the door." (*Id*.). He decided he needed to act to prevent Omuna from hurting himself. (*Id*. at 261-62).[27] He felt that Omuna was "out-of-control." (*Id*. at 262). He was concerned that Omuna would hurt himself. (*Id*. at 287).

He left the immediate area to get the NOVA Shield before they went into the cell.[28] (Tr. at 264). He was gone three to four minutes. (*Id*. at 264). The shield was intended for protection. (*Id*. at 265). Teal returned and told Omuna three times to move away from the door. He did not

---

[26] He did not see Omuna becoming violent or his being sprayed with mace. (Tr. 256-58). His information concerning these events that is detailed in his incident report comes from interviews of other persons. (*Id*. at 258). The incident report is found at plaintiff's exhibit 3.

[27] Teal had prior instances where inmates had run into doors and hurt themselves, "bust[ing] the side of their head, bust[ing] their face." (Tr. at 262).

[28] Teal had prior training in the use of the shield and was certified in its use. (Tr. at 303).

13

comply, but continued hollering and screaming. (*Id*. at 301). Teal and the four other officers entered the cell. (*Id*. at 265). Teal moved Omuna to the wall, using the shield.[29] (*Id*. at 266). He activated the shield when Omuna turned toward Teal's left side. (*Id*. at 267, 285-86). Omuna was pushed back to the wall with Freeman's help. (*Id*. at 267). Teal activated the shield a second time and Omuna settled down. (*Id*. at 268-69, 303). Omuna was told to sit down. He started down, then raised up. The officers then forced him to the floor. (*Id*. at 270). They checked the handcuffs to make sure they were not unduly binding Omuna. (*Id*. at 272-73). About this time, Omuna started threatening to kill somebody. (*Id*. at 273-76, 286, 306). This prompted Teal to order him taken to the restraining chair. (*Id*. at 276).[30]

Omuna was taken to the chair by two officers, with Teal trailing them with the shield. (*Id*. at 277-78). A helmet was placed on Omuna's head to protect him from hitting his head against the wall. (*Id*. at 307). He was checked on by Teal and the nurse. (*Id*. at 282-84, 308-09). According to Teal, Omuna was in the chair between forty and forty-five minutes. (*Id*. at 307-08). Teal stated that he removed Omuna from the chair shortly after he started his shift at 2:00 p.m. (*Id*. at 308). This was during his second check on him. (*Id*.) Omuna did not request medical care after Teal removed him from the chair. (*Id*. at 308). He was placed in holding cell three for one to two hours. (*Id*. at 310).

Omuna also apologized to Teal for the way he acted on the date of the incident. (Tr. at 311).

Teal did not see to it that the use of the shield was videotaped because of the time

---

[29] He stated that when he entered the cell, he intended to use it as a defensive device. (Tr. at 302).

[30] Teal's affidavit reflects that Omuna had a violent propensity; however, he testified that he had no specific knowledge of violent instances. (Tr. at 282).

constraints and his concern for Omuna.[31]  He stated this was not the typical "cell extraction," which would have allowed time to get the camera.[32]  (Tr. at 288-89).

He prepared his incident report before he left at the end of his shift.  (*Id.* at 295).

### 6. George Randell Taylor

Taylor was employed by the INS in June 1999.  He was familiar with Omuna because he was "an aggravated felon due to his conviction for perjury in California."  (Tr. at 323).  Taylor was formerly the Chief of Detention and Removal.  (*Id.* at 323).  "Etowah County Jail was a facility that was tasked with handling some of the worst detainees that [the INS] had in custody."  (*Id.* at 324).  He identified Omuna as a "manipulative personality" who "wanted it his way or no way."  (*Id.* at 326).

Taylor went to the Etowah County facility on June 4, 1999, making his periodic visit.  (Tr. at 327).  He saw Omuna when he arrived.  As best he could recall, it was late in the day, evening, maybe after dark.  (*Id.* at 328, 332-334).[33]  Omuna told him that he had been beaten by the guards.  (*Id.*).  He was confined in the restraint chair, but showed no signs of having been harmed.  (*Id.* at 329, 331-32).  Taylor noted an odor of chemical spray.  (*Id.*).  Omuna was still upset.  (*Id.* at 330).  Taylor told him he would look into the matter and that he should calm down.  (*Id.*).  He never told Omuna that he had seen a video of the incident.  (*Id.* at 330-31).  Omuna did

---

[31] The policy requires that "**EVERY TIME THAT THE SHIELD IS USED IT WILL BE VIDEOTAPED, AND THE INCIDENT WILL BE REPORTED TO THE CHIEF OF CORRECTIONS IN THE FORM OF A WRITTEN INCIDENT REPORT.**" (Pl. Ex. 1, p. 3) (emphasis in original).

[32] Officer Freeman described a "normal cell extraction" as involving a noncompliant assaultive inmate and time to plan a course of action. (Tr. at 466). This situation was different in that Omuna was aggressive towards the guards but also directed his anger toward himself. (*Id.* at 465-66).

[33] Ultimately, Taylor stated that it could have been about 5:30 p.m. when he arrived at the jail. (Tr. at 338). When he left at 7:00 p.m., Omuna was still strapped in the chair. (*Id.* at 339). According to Omuna's rebuttal to the defendant's special report, Taylor arrived about 2:00 p.m. and left around 5:20 p.m. (Doc. 30, p. 11).

not ask for any medical attention. (*Id.* at 331).

### 7. Jeffrey Burdick

Burdick saw Omuna "thrashing violently" when Garrard and Lankford were moving Omuna in to the cell. (Tr. at 344, 354). He could not hear what Omuna was saying, but he did hear one of the officers say something about the phone on the desk at one point.[34] (*Id.* at 364). When Omuna resisted and attempted to leave the cell, one of the officers "nudged him in." (*Id.* at 365-66). Burdick responded by assisting Garrard and Lankford. Omuna was kicking and pushing off the wall and the commode in the cell. (*Id.* at 365). Burdick ultimately sprayed Omuna with a burst of "Freeze Plus P" after they could not control him. (*Id.* at 345, 367-68). The spray made Omuna more upset. (*Id.* at 368). Freeman arrived after that. (*Id.* at 345, 368-69). Omuna continued to resist and they all ended on the floor. (*Id.* at 369). Teal also arrived, but initially did not assist other than by just "being present." (*Id.* at 346, 356). Freeman did assist them. (*Id.* at 356).

Burdick observed Omuna being shocked twice by the shield.[35] (*Id.* at 347-48). Burdick heard Omuna threaten to kill and/or sue the officers. (*Id.* at 365). Burdick also recollected that Omuna was restrained in the chair about 45 minutes. (*Id.* at 357, 370). Burdick looked in on Omuna while he was in the chair, although he could not recall how many times he did so. (*Id.* at 358, 371).

Burdick also identified the video that depicted Omuna leaving the cell area to be taken

---

[34] Burdick stated that the officers had a problem with inmates wanting to use the phone in the booking area because there is no cost to use it, unlike the other phones that require the payment of "outrageous collect call prices." (Tr. at 364).

[35] In his incident report, he stated that the shield was used numerous times. At trial, he explained that this meant that it was used to pin Omuna against the wall. (Tr. at 347).

back to his cell block at approximately 5:39 p.m.[36] (Tr. at 376). According to Burdick, Omuna did not show any signs of distress on the video. (*Id*. at 378). In fact, Burdick stated that Omuna "looks like he's feeling pretty good."[37] (*Id*.). Burdick further noted that he was surprised by Omuna's actions–his "[s]napping, going off, berserk." (*Id*. at 378-79). He also stated that he did not handcuff Omuna when taking him back to his cell on the third floor.[38]

His incident report was dated June 25, 1999. He could not account for the fact that the date of the report was approximately three weeks after the incident.[39] (Tr. at 359).

### 8. Casey Freeman

He was working in the booking area on June 4, 1999. He did not know Omuna prior to the incident at issue in this case. (Tr. at 401). He observed Lankford and Garrard struggling with Omuna, whom he described as a strong and stout individual. (*Id*. at 401, 404, 418-19). He was hollering, kicking, and struggling. Freeman proceeded towards the officers to assist them. Burdick was also there. Freeman and Burdick held Omuna so Lankford and Garrard could get out of the cell. Garrard was contaminated with the spray.[40] (*Id*. at 420). Freeman tried to calm Omuna, but Omuna was verbally abusive and still struggling. (*Id*. at 404-05, 421). All the guards were able to work themselves out of the cell. (*Id*. at 421). He closed the door once they

---

[36] This video was available only because another inmate was being booked at the time that Omuna walked through the booking area. (Tr. at 381). It is not activated all the time. (*Id*.).

[37] The court struck this last comment, but has viewed the tape and notes that Omuna is walking normally and does not show any obvious adverse effects from the incident.

[38] This was a violation of the Jail's policy of moving inmates housed in the maximum security unit. (Tr. at 528). Jail Administrator Williamson testified that he felt that Burdick was within his discretion in not requiring handcuffs under the circumstances. (*Id*.).

[39] The report is found at plaintiff's exhibit 4.

[40] Although Freeman stated in his affidavit that he saw Burdick use the spray, he admitted at trial that he did not see it, but was told it was used by Burdick. (Tr. at 461-62).

17

were out of the cell. (*Id*. at 422).

Omuna "started ramming the door, kicking the door, screaming, basically what he was doing when [the deputies] were fighting with him, . . . except that he was ramming the door. . . ." (*Id*. at 406, 422, 455). Teal decided that Omuna needed to be transferred to the restraining chair. (*Id*. at 426). Teal went and got the shield. Teal repeatedly told Omuna to get away from the door. (*Id*. at 406, 429-32). Omuna failed to comply, so they entered the cell. (*Id*. at 406-07, 429). Teal "pinned" Omuna against the wall using the shield. (*Id*. at 406-07). Omuna was shocked by Teal shortly thereafter when he attempted to push off the wall. (*Id*. at 407, 431, 434). Omuna became more aggressive and "combative." (*Id*. at 408, 434). Omuna was continuously being told to calm down. (*Id*.). Teal shocked him again at the door as he was still "combative." (*Id*. at 436-37, 440). Omuna was forced to the ground. He was face down on his stomach. (*Id*. at 439). He was held about two minutes until he calmed down.[41] (*Id*. at 408). They continued to restrain Omuna for a couple of minutes. Freeman did not see anyone place a knee on Omuna's chest. (*Id*. at 409).

Freeman and Burdick took Omuna to the restraining chair. Teal followed. (*Id*. at 411). Freeman used a towel on Omuna's face to remove the spray. (*Id*. at 414). Omuna remained in there about 45 minutes. Freeman checked on him at least once before he left at 2:00 p.m. (*Id*. at 413, 443, 457, 468). To his best judgment, Omuna was back in the holding cell when he left. (*Id*. at 468-69). He also recalled Burdick and two nurses checking on him while he was in the chair.[42] (*Id*. at 413-14, 443-45). Freeman did not recall seeing any injuries on Omuna. (*Id*. at

---

[41] He was still verbally abusive. (Tr. at 441).

[42] No log was kept to document when Omuna was checked. (Tr. at 444).

415).

Freeman filled out his incident report on the same day.[43]  He was uncertain of the time. (*Id.* at 424).

### 9.  Jonathan Jason Whitlock

Whitlock was familiar with Omuna, having worked with him on three different units in the jail.  (Tr. at 476-77).  He testified that Omuna's reputation for truth and honesty was not good.  (*Id.* at 486).

### 10.  Wes Williamson

Williamson was the Jail Administrator.  He explained the 120 hour training program for jail personnel and the 80 hour jail management course for the staff that is used by the County. (Tr. at 497-98).  He discussed the policy that required that use of the NOVA Shield be taped.  He stated that the policy had been changed[44] to not require the use of videotaping when someone was hurting themselves.  (*Id.* at 500).  He also stated that the failure to tape this incident was a violation of the existing policy at that time.  (*Id.* at 503).  The officers were not disciplined because Williamson felt they acted appropriately.  (*Id.*).  He felt that Teal had a reasonable belief that Omuna could harm himself.  (*Id.* at 505).

Williamson also stated that restraint chairs are commonly used in jails to "[i]mmobilize a person where they can no longer be a threat to themselves, to us or to anybody."  (Tr. at 506).  It is not a punitive device.  (*Id.*).  Williamson saw Omuna in the chair around 2:00 p.m. on the day of the incident.  Omuna saw him and wanted to talk with him.  (*Id.* at 509).  Omuna was agitated,

---

[43] The incident report is found at plaintiff's exhibit 5, which was not offered in evidence.

[44] The policy was changed after this incident.

but did not appear to be in any distress. (*Id.*). After talking with Teal, Williamson talked with

Taylor around 2:00 p.m. (*Id.* at 510). Williamson told Taylor what had occurred as Taylor had

just arrived. Taylor wanted to talk with Omuna, which he did. (*Id.* at 511). After Taylor came

out, Williamson and Taylor went to the Sheriff's office for around thirty to thirty-five minutes.

(*Id.* at 512). When Williamson returned to the booking area, Omuna was no longer in the chair.

(*Id.* at 513). It was about fifteen or twenty minutes after 2:00 p.m. He then observed Omuna in

the holding cell. (*Id.*).

Williamson testified that the officers are required to put everything down in their incident

reports. (Tr. at 517). He also stated that he believed it was correct that they should write down

what the particular officer observed. (*Id.*). The reports are also to be completed by the end of the

tour of duty. (*Id.* at 517-18). Williamson stated that Lankford's report was not complete under

the then existing policy. (*Id.* at 520). Williamson did not know why Garrard's incident report

was not in the file. (*Id.* at 516).

### B. The Law

The Eighth Amendment prohibition against cruel and unusual punishment is triggered

when a prisoner is subjected to an "unnecessary and wanton infliction of pain." *Whitley v.*

*Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084, 89 L. Ed. 2d 251 (1986). The Supreme Court

held in *Hudson v. McMillian*, 503 U.S. 1, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992), that

"whenever prison officials stand accused of using excessive physical force in violation of the

Cruel and Unusual Punishment Clause, the core judicial inquiry [in determining whether a

prisoner has suffered unnecessary and wanton pain] is that set out in *Whitley*: whether force was

applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to

20

cause harm." *Id.* at 7, 112 S. Ct. at 999. *See also Skrtich v. Thornton*, 280 F.3d 1295, 1300-01

(11th Cir. 2002); *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999); *Harris v. Chapman*, 97

F.3d 499, 505 (11th Cir. 1996). In extending *Whitley* to all cases involving allegations of force,

the Court reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards
> use force to keep order. Whether the prison disturbance is a riot or a lesser
> disruption, corrections officers must balance the need "to maintain or restore
> discipline" through force against the risk of injury to inmates. Both situations
> may require prison officials to act quickly and decisively. Likewise, both
> implicate the principle that "'[p]rison administrators . . . should be accorded
> wide-ranging deference in the adoption and execution of policies and practices
> that in their judgment are needed to preserve internal order and discipline and to
> maintain institutional security.'"

*Hudson*, 503 U.S. 7, 112 S. Ct. at 998-99 (citations omitted). With these concerns in mind, the

Court set out certain factors that should be considered in evaluating whether the use of force was

unnecessary and wanton. They include (1) the need for the application of force, (2) the

relationship between the need and the amount of force used, (3) the threat reasonably perceived

by the prison official, (4) any efforts made to temper the severity of a forceful response, and

(5) the extent of the injury suffered by the inmate. *Hudson*, 503 U.S. at 7-8, 112 S. Ct. at 999.

*See also Skrtich*, 280 F.3d at 1300-01. The Court made it clear that the extent of injury suffered

by the inmate is only one of the many factors which should be considered, but not necessarily a

decisive one, when it said, "[t]he absence of serious injury is therefore relevant to the Eighth

Amendment inquiry, but does not end it." *Hudson*, 503 U.S at 8, 112 S. Ct. at 999.

In resolving the conflicts presented in this action, the court must also keep in mind the

Supreme Court's admonition that "[p]rison administrators . . . should be accorded wide-ranging

deference in the adoption and execution of policies and practices that in their judgment are

21

needed to preserve internal order and discipline and to maintain institutional security." *Hudson*,

503 U.S. at 7, 112 S. Ct. 995 (quoting *Whitely*, 475 U.S. at 321-22, 106 S. Ct. 1078 (quoting *Bell*

*v. Wolfish*, 441 U.S. 520, 547, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)).  However, "[t]he use of

force must stop when the need for it to maintain or restore discipline no longer exists." *Skrtich*,

280 F.3d at 1303 (citing *Whitley*, 475 U.S. at 320-21, 106 S. Ct. at 1078).[45]

## IV.  DISCUSSION

### A. Generally

As already stated, the evidence at trial requires this court to make a credibility choice

between two divergent positions.  The plaintiff claims that while he was in handcuffs, he was

sprayed in the face with a chemical spray and was shocked on four occasions with an electric

shock shield, after which he was placed in a restraint chair and helmet for hours while no guard

was in any danger.  The defendants counter that the plaintiff "has completely failed to meet his

burden of proof in this matter." (Doc. 96, p. 4).  This court must now resolve these factual and

legal disputes.

In examining the issues, the court has evaluated the traditional credibility considerations,

including the demeanor of each witness, the bias or interest in the outcome of this litigation of

each witness, the witnesses' recollection of events, and any inconsistencies between the trial

testimony and prior statements, whether in an incident report, affidavit, or at a deposition.

After consideration of all the evidence, the court finds that the plaintiff has not satisfied

---

[45] In his reply brief, Omuna's counsel states that his claim arguably arises under the Due Process Clause which is applicable when the plaintiff is a pretrial detainee. (Doc. 97, p. 6 at n.3).  The Due Process Clause prohibits punishment of pretrial detainees and protects them from the use of excessive force that amounts to punishment. *Graham v. Connor*, 490 U.S. 386, 396 n.10, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (citing *Bell v. Wolfish*, 441 U.S. 535-39, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).  The issue there is whether the action is for the purpose of punishment or whether it is reasonably related to a legitimate and nonpunitive governmental objective. *Bell*, 441 U.S. at 538-39.

his burden of proving his claim by a preponderance of the evidence for various reasons. Because of the significance of each reason, they will be addressed individually.

First, the plaintiff's testimony, particularly his demeanor, demonstrated that he was prone to exaggeration and distortion. By way of example, he previously stated that he "was brutally beaten in a total of twenty-two to twenty-five minutes nonstop except for one or two jailers resting due to fatigue while others continued" (Tr. at 94); that Garrard and Burdick emptied cans of pepper spray in his face (Tr. at 95, doc. 30, p. 2); and, that Teal shocked him over 15 times with the shield, including when he was on the floor (*id*. at 98-99). At trial, he did not testify to a continuous beating. Quite to the contrary. Additionally, there was no testimony that Garrard and Burdick emptied two cans of spray in his face. Omuna testified that Teal shocked him four times, not fifteen times. Omuna also stated that Taylor told him that he had seen what they did to him on the tape. Taylor testified, however, that he never told Omuna that he had seen a video of the incident.[46]

Second, the court is not impressed by the plaintiff's claims of physical and mental injuries as a consequence of the incident. He claims to have suffered "[s]wollen hands, [severe] shoulder [and] neck . . . pain, [a] bleeding nose, dislocated fingers, severe chest pain and a host of others." (*Id*. at 73). He also stated that his previous back injury was worsened (*id*. at 82); that his speech was "very distorted" (*id*. at 79); that he needed to take "fifty milligrams of Elavil just to make [him] sleep" (*id*.); and, that as a result of this incident he suffers from "flashack[s]," "severe anxiety, sleeplessness," and "paranoi[a]" (*id*. at 79-80). He asserts that he told the doctor of his injuries. (*Id*. at 73, 76; Ex. 15). Yet, when the doctor examined him (*id*. at 78), he observed "no

---

[46] There is no evidence any such tape ever existed.

23

lacerations, [a] full range of motion without difficulty, no spasms, . . . no edema, no . . . tenderness, [and that his] eyes [were] PERRLA [(pupils are equal and reactive to light)]." These observations are not consistent with the testimony offered by Omuna; but is more consistent with that offered by the defendants.

Third, the court also finds the commonality of the testimony of the defendant's significant. It did not appear collusive or rehearsed, but struck the court as genuine. This is true even though it appears that the defendants spent little time in preparing their incident reports and affidavits in this matter. There is no question that there are discrepancies in the testimony of each; however, that is expected because people perceive, record and recollect events differently.

Fourth, the testimony of the non-defendant witnesses, Preston, Freeman, Williamson, and Taylor to a lesser extent, is corroborative of the defendants' version of the events. None of the non-defendant witnesses appear to have any reason to lie under oath in the present circumstances. The court recognizes that these witnesses did have, and still have in certain instances, a working relationship with the defendants. The court does not find this to be significant enough to effect the sum and substance of their testimony.

In assessing the evidence, the court also finds that the plaintiff's conduct at the cell – balking at entering – and his actions thereafter – violently acting out – warranted the defendants' use of the "Freeze Plus P," the NOVA Shield and the restraint chair. As noted above, the court is to look at five factors as guideposts in reaching a conclusion: (1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the threat reasonably perceived by the prison official, (4) any efforts made to temper the severity of a forceful response, and (5) the extent of the injury suffered by the inmate.

### B. The Five Considerations

#### 1. Need for the application of force

In considering the need for the use of force in this case, the court must examine each instance of force individually, as well as the amount of force collectively used. At the outset, the court finds that the evidence fails to demonstrate that the events that are in dispute were precipitated by conduct that occurred before Omuna reached the first floor. Although counsel for Omuna correctly states that many of the witnesses described Omuna "as 'a complaining inmate,' 'a pain in the ass,' 'wanting to be a special case,' 'always wanting to use the telephone,' 'always wanting to do something . . . other than what he's supposed to be doing,' 'demanding,' 'manipulative,' 'uncontrollable,' 'want[ing] it his way or no way,' not wanting to follow the rules, and trying to play one guard off another," there is no evidence that these attitudes precipitated the events of June 4. (Doc. 97, p. 8). For what ever reason – the telephone or simply not wanting to be compliant – Omuna balked at going into the cell. The court finds that Omuna resisted the directions of the officers and therefore Garrard and Lankford were justified in precipitating the plaintiff's placement in the cell.

There is no doubt in the court's mind that when Omuna was forced by Garrard and Lankford to enter the cell, events escalated and a struggle ensued. Upon observing the situation, Burdick responded. He very quickly assessed the circumstances and reacted by using the chemical spray. It is evident that this was in direct response to his observations and training as a law enforcement officer. He reasonably perceived Omuna to be a serious threat to the officers. Unfortunately, instead of quelling the situation, it appears to have exacerbated Omuna's reaction. Additionally, it resulted in Garrard being sprayed and having to leave the cell during the

25

altercation. Burdick's response cannot, under the circumstances, be deemed unnecessary or unreasonable.[47]

The next use of force, the activation of the NOVA Shield by Teal, was in response to the plaintiff's aggressive actions following the officers' leaving the cell. Again, for what ever reason, Omuna reacted to the situation in an explosive fashion by striking the walls and door with his body. He was yelling and screaming. Teal's attempts from outside the cell to calm Omuna failed. Omuna remained noncompliant and combative. In view of Omuna's previous reaction to the directions of the officers and his reaction to the chemical spray, the court finds that Teal was justified in determining that the NOVA Shield was an appropriate tool to use when reentering the cell. Omuna gave them adequate reason to be concerned for his safety. Additionally, after the officers reentered the cell, the shield was not activated immediately but only in response to Omuna's turning towards Teal and pushing off the wall. (Tr. at 267, 285-86, 407).

---

[47] Although Garrard's testimony showed that Burdick's use of the chemical spray resulted in Omuna becoming angry (Tr. at 128-29), that is insufficient to state a claim under the present facts and circumstances. To the extent that Omuna asserts that Burdick violated the Etowah County Jail policy concerning the use of chemical agents, the court disagrees. The policy states:

1. The Shift Commander may authorize the use of [chemical agents or the NOVA Shield] after reporting to the scene and assessing the situation.

2. The use of Riot Equipment [(including chemical agents)] is authorized when:

   a. Lesser degrees of force have failed to bring a disturbance under control.

   b. Prompt use is calculated to prevent or to discontinue a serious incident involving violence or bodily harm.

3. Individual officers may be placed in an emergency situation which merit[s] the immediate use of individual [c]hemical spray. This action will be reported to the shift supervisor immediately, and will be followed by an incident report.

(Pl. Ex. 1, p. 2). The court does not find that this policy precluded Burdick from using the spray in the present circumstances. There was no testimony from Jail Administrator Williamson, or anyone else, that Burdick violated policy in using the spray. Even if it could be found that he was outside the literal language of the policy, that does not alter this court's conclusions in this matter.

26

Finally, the court finds that premised on Omuna's reactions to the actions of the officers, Teal was justified in using additional restraint on Omuna to ensure further compliance and that he did not hurt himself. The use of the restraint chair was appropriate, it was not malicious under the circumstances.[48]

## 2. The relationship between the need and the amount of force used

The force used by the defendants was proportional to the actions of Omuna. It was a graduated response. Initially, the only force that was exerted by Garrard and Lankford included verbal commands and directing Omuna into the cell through the use of their hands and arms. That was reasonable. The level of force exerted escalated with the use of the spray premised on Burdick's observation of Omuna's physical resistance and Garrard and Lankford's struggle with him. In view of Omuna's resistance to Garrard and Lankford's commands and physical directions, this response was reasonable. To the extent that Omuna asserts that Burdick's use of the spray was the "real problem," the court does not agree. Although counsel is correct that Garrard testified that he could have exited the cell after Omuna was placed on the bed on his knees, it is necessary to place that statement in context. (Doc. 95, p. 7). Garrard further testified that it was his and Lankford's plan if Omuna "had . . . not resisted." (Tr. at 120). It was the continued resistence that necessitated the escalation of the level of force.[49] Additionally, the

---

[48] In reaching this conclusion, the court accepts the testimony that the chair was "uncomfortable." (Tr. at 447). This is not enough under the circumstances to support Omuna's claim.

To the extent that Omuna asserts that the use of the chair violated the Etowah County Jail Policies and Procedures, the court disagrees. (Doc. 95 at 18). Although Omuna was "absolutely calm" before he was placed in the chair, premised on his prior outbursts, he still presented a risk of injury to himself and others. (Tr. at 141-42). Just before his placement in the chair, he threatened to kill someone.

[49] To the extent that Omuna asserts that "neither guard was at risk of injury" at this point, the court also disagrees. (Doc. 95, p. 8). Omuna was resisting and the officers were reacting within a confined area. The court finds that there was a "risk of injury" to the officers and Omuna as a result of the struggle.

27

court finds Garrard's testimony that Omuna was "thrashing around" supports Burdick's decision to use the spray. (Tr. at 124-25).

The situation escalated to another level when Omuna was kicking and otherwise striking the door and he refused to comply with Teal's commands.[50] Teal activated the shield only after warning Omuna to calm down and after using the shield in a defensive posture were not effective. The court finds that the use of the activated NOVA Shield to control Omuna was consistent with the need for force.[51]

The use of the restraining chair was the next exertion force or control. However, it was a less significant and less invasive force. Under the circumstances, including Omuna's violent outbursts and his recent threat to the officers, its limited use was consistent with an attempt to control an unruly inmate. The appropriateness of its use is demonstrated by Williamson's testimony that Omuna was agitated and Tyler's testimony that he was still upset when they saw him.

One of the disputes presented by the facts is how long was Omuna in the chair. The defendants assert it was approximately 45 minutes. Omuna asserts that it was four hours and twenty-five minutes. The evidence on this issue is very diverse. Lankford states that he checked on Omuna in the chair at 4:00 p.m. (Tr. at 245-46).[52] Teal testified that Omuna was in the chair

---

[50] The court disagrees with Omuna's assertion that the testimony regarding his "attacking the door" is "simply unbelievable." (Doc. 95, p. 11).

[51] The court agrees with Omuna that the failure to videotape the use of the shield violated the jail policy as it existed at that time. However, Williamson stated that he did not discipline the officers because he felt that they acted appropriately under the circumstances. (Tr. at 504). The court does not find this significant enough to alter the court's conclusion in this matter.

[52] The pertinent portion of the transcript provides:

Q.      Do you know how long he was strapped in the restraint chair?

A.      No, Sir.

about forty minutes.  (Tr. at 308).  He recalled it being about 2:00 p.m. when Omuna was taken

out because he had just started his shift.  (*Id.*).  Omuna was then placed in the holding cell for

---

| | |
|---|---|
| Q. | Do you know if anybody checked on him while he was in the restraint chair? |
| A. | I personally checked on him once. |
| Q. | When did you do that? |
| A. | Right before I left. |
| Q. | You did that before you filled out your incident report? |
| A. | No, I said - - you're trying to make me say something I don't want to say. |
| Q. | I'm asking a question. |
| A. | I checked on him right before I left work. |
| Q. | What time did you leave that day? |
| A. | It was about 4:00 o'clock. |
| Q. | Okay.  So you said you went upstairs about 2:00 o'clock to fill out your incident report? |
| A. | Right. |
| Q. | Your said it took you two hours to fill out your incident report? |
| A. | I said it took me two hours to get my head clear, then write the report. |
| Q. | When did you check on Mr. Omuna in relation to when you filled out your incident report? |
| A. | About two hours later. |
| Q. | So you filled out your incident report first, and then you checked on him? |
| A. | I was upstairs. |
| Q. | You didn't feel it was necessary to note that in the incident report? |
| A. | No. Sir. |

(Tr. at 245-46).  On recross, the following colloquy occurred:

| | |
|---|---|
| Q. | You said you checked on Mr. Omuna while he was in the restraint chair; is that right? |
| A. | Yes, sir, I did. |
| Q. | Was that before or after you went upstairs to do your report? |
| A. | That was before I went up there. |

(Tr. at 251-52).

one to two hours.  (*Id.* at 310).  Taylor's best judgment was that he arrived at the jail late in the day, maybe after dark, maybe 5:30.  (*Id.* at 328, 332-34, 338).  He stated that Omuna was still in the chair when he left at 7:00 p.m.  (*Id.* at 338-39).  The video in the booking area, which was identified by Burdick, showed Omuna being returned to his floor at 5:39 p.m.  (*Id.* at 376).  Freeman testified that Omuna was not in the chair when he left right after the shift change at about 2:00 p.m.  (*Id.* at 412, 423, 456, 468-69).  Williamson testified that Omuna was not in the chair when he went to the booking area around fifteen or twenty minutes after 2:00 p.m.; he was in the holding cell.  (*Id.* at 513).

The court is convinced that Taylor is wrong about Omuna being in the restraining chair at 7:00 p.m.[53]  The credible evidence demonstrates that the time spent in the chair was much closer to 45 minutes than it was to four hours and twenty-five minutes.  The court finds the testimony of Freeman on this issue to be credible.  He was not a defendant in this action and his candor particularly impressed the court.[54]  Also, it is consistent with the testimony of Williamson, another non-defendant.

Even if Omuna was restrained for a longer period, close to the time he was observed on the video at 5:39 p.m., there is no evidence of any adverse effect on him as a consequence of that restraint.  The video clearly demonstrates the contrary.  Additionally, the court is satisfied that Omuna was checked by various staff members and Preston during the time he was restrained.

---

[53] The court notes that even Omuna has stated in prior pleadings that "Taylor arrived about 2 pm and left about 5:20 pm. . . ." (Doc. 30, p. 11).

[54] By way of example, when pressed as to whether he knew exactly where Omuna was when he was not in the chair, he acknowledged that he did not know.  (Tr. at 468-69).

### 3. The threat reasonably perceived by the prison officials

It is said oftentimes that hindsight is "20/20." However, in the present matter, the court is to examine whether the defendants' perception of the threat from Omuna was reasonable. The court finds that it was. While affording law enforcement officials appropriate deference in the initiation and implementation of its policies, the court has not been unduly deferential, particularly regarding this consideration. Instead, it has objectively examined the events and the defendants' perception of the same.

### 4. Any efforts to temper the severity of the response

As was discussed above, the court finds that the defendants tempered their actions in various ways. First, this altercation resulted from Omuna's failure to follow voice commands. Second, the officers continually asked Omuna to calm down. Third, the officers exited the cell in an effort to calm him. That was not successful, however, as demonstrated by Omuna's outbursts in striking the walls and the door. Fourth, before going back into the cell, Teal directed Omuna at least three times to move away from the door without any success. Fifth, the use of the restraint chair was an effort to protect Omuna by restricting the possibility of further outbursts and was reasonable in light of his actions and threatening comment. The defendant's efforts reasonably were tempered in response to the resistance they were confronted with and the need to maintain order.

### 5. The extent of the injuries

According to Omuna, his injuries were extensive. Specifically, he claims to have sustained significant injuries, including swollen hands, shoulder and neck pain, a bloody nose, dislocated fingers, severe chest pain, and a host of others. (Tr. at 73). His previous back injury

31

was also aggravated (*id*. at 82); his speech was "distorted," (*id*. at 79); and, he suffers from psychological trauma, including sleeplessness, flashbacks, anxiety, and paranoia (*id*. at 79-80). The doctor's June 9, 1999 evaluation does not corroborate these extensive injuries. (*Id*. at 78). The observations of Preston and Taylor do not corroborate the alleged injuries.

The court has no doubt that Omuna suffered pain and discomfort from the handcuffs, the chemical spray, and the use of the NOVA Shield. However, that was a consequence of his actions. As previously cited herein, the court has viewed the videotape of Omuna leaving the booking area to return to his assigned cell. Although not a closeup view of Omuna, it evidences none of the trauma asserted by him. He is walking in a manner that the court perceives to be normal. Additionally, at trial, the court noted no distortion in Omuna's speech. Lastly, the record is clear that Omuna had back problems prior to the incident.

All things considered, the court finds that Omuna's physical condition was unremarkable in view of his resistance and the actions of the officers. Because of his inclination towards exaggeration, the court is not impressed by his claims of sleeplessness, flashbacks, anxiety, and paranoia in light of all the other evidence.

In discussing Omuna's injuries, the court also deems it important to state that it finds no credible evidence that the defendants acted maliciously or sadistically with the intent of harming Omuna. If the court found they acted with such intent, Omuna could recover nominal damages regardless of his failure to prove compensable injury. *See Slicker v. Jackson*, 215 F.3d 1225, 1231-32 (11th Cir. 2000) ("a § 1983 plaintiff alleging excessive use of force is entitled to nominal damages even if he fails to present evidence of compensable injury").

32

### C. Other Considerations

In reviewing the evidence, the court agrees with counsel for Omuna that the excessive force cases cited by the defendants are factually distinguishable.[55] This case must be, and was, examined premised on the particular facts and circumstances presented at trial.

The court also notes that Omuna's counsel correctly points out that the defendants submitted affidavits that included inaccuracies and certain trial testimony was contradicted by prior deposition testimony. (*See* Doc. 95, p. 6). The discrepancies have been noted by the court, but were not sufficient impeachment to alter the court's assessment of whether the plaintiff has met his burden of proof on his excessive force claim.

The court has also fully considered the plaintiff's arguments and the evidence that certain jail policies and procedures were not strictly followed. However, these deficiencies are insufficient individually or in sum to alter the court's findings.

## V. CONCLUSION

The plaintiff had the burden of proof and he has failed to convince the court that the defendants exerted excessive force or that they acted with the necessary intent.[56] Judgment is therefore due to be entered in favor of the defendants. An order consistent with this court's findings will be entered.

---

[55] The defendants cite to *Campbell v. Sikes*, 169 F.3d 1353 (11th Cir. 1999), *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990), and *Brown v. Smith*, 813 F.2d 1187 (11th Cir. 1987).

[56] Even if Omuna's claim was advanced under the Due Process Clause, the court would find in favor of the defendants. He has not satisfied the court that the defendant's actions were punitive. The court finds that they were reasonably relative to the legitimate governmental objective of restoring and maintaining order in the jail.

**DONE**, this $\underline{\textbf{30th}}$ day of May, 2002.

_John E. Ott_

**JOHN E. OTT**
United States Magistrate Judge